**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **COURTNEY PRICE,**<br>5502 Trent Street<br>Clinton, MD 20755<br><br>*Plaintiff*,<br><br>vs.<br><br>**CITY OF ALEXANDRIA**<br>Office of the City Attorney of Alexandria<br>301 King Street, Room 1300<br>Alexandria, VA 22314<br><br>*Defendants*. | Case No: 1:19-cv-1200<br><br>Civil Complaint<br><br>**Jury Demand** |

## COMPLAINT

**COMES NOW** the Plaintiff, Courtney Price ("Price"), by and through undersigned counsel, and for his Complaint states as follows:

### PARTIES

1. Price is a 37 year-old African-American male residing in Clinton, Maryland. Price was employed by the Defendant City of Alexandria in its Transportation and Environmental Services Department in Alexandria, VA office from September 2018 until the day of his termination on January 2019.

2. The Defendant City of Alexandria ("the City") a City in the Commonwealth of Virginia with various offices and departments to fulfill their roles city-wide.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action Under U.S.C § 1331. The action under Title VII for race discrimination and retaliation is being brought under 42 U.S.C § 2000(e) *et.seq.*,

4. Venue is proper in the Court because both the Plaintiff and the Defendants are within this Court's jurisdiction; the Plaintiff was also employed and terminated by the City while working at their office in Alexandria, Virginia.

## EXHAUSTION OF ADMINISTRATIVE REMEDITES

5. On May 9, 2019, Price filed a *Charge of Discrimination* with the Equal Employment Opportunity Commission ("EEOC") Washington D.C. field office (**Ex A**).

6. On June 19, 2019, the EEOC issued a *Notice of Right to Sue* letter (**Ex B**).

7. There are no administrative exhaustion requirements under section 1981.

8. On Tuesday September 17, 2019, or well within 90 days, this *Complaint* was filed in this Court.

## STATEMENT OF FACTS

9. Price is a United States citizen. Price was born in Washington, DC and raised in Clinton, MD.

10. Price attended college at both The Tuskegee University and Morgan State University where he studied electrical engineering.

11. Price is single and has been in a relationship with his girlfriend, Jennifer Bell, since 2014.

12. Jennifer Bell is employed by the City of Alexandria.

13. In 2018, Price was working for PEPCO and was well liked by his chain of command, but desired better benefits and opportunity for promotion.

14. On August 3, 2018, Price interviewed for the Civil Engineer III (Development Review) position with the City of Alexandria.

15. On August 28, 2018, Price was offered the Civil Engineer III (Permits Manager) position.

16. On September 10, 2018, Price's first day, he rode with Brenda Hall ("Hall"), a senior inspector with the City of Alexandria, in her red Ford Explorer (personal vehicle), which she parked directly in front of City Hall.

17. Hall displayed an orange parking placard, used by inspectors, in her personal vehicle which she used to commute around the City to do inspections.

18. On September 14, 2018, his supervisor, Heather Diez ("Diez"), asked during a welcome lunch "How do you know Jennifer?" to which Price responded "I know her from over the bridge" and added nothing further as he did not want to disclose the relationship during his first week.

19. Price was registered for the October Defensive Driving Course, a requirement for driving a City vehicle. Until then, he drove his personal vehicle to work sites. Price would park his personal vehicle in the Market Square parking garage ($2.50/hour or $10/day), park in 2-hour street parking and moved his car every two (2) hours or paid the meter.

20. Danyell Jones, Price's subordinate, heard that Price was paying to park and asked why he was paying to park, and she gave him a parking placard and advised they were for inspectors as they drove around to sites.

21. At the time (September 2018), the Permit Center could not use pool vehicles due to budget restrictions. Thus, only one inspector drove the vehicle provided by the City and all other

inspectors were forced to use their personal vehicles to go to work sites as there were too many to cover if the inspectors decided to ride together.

22.     Price was provided with a work cell phone during his first week in his new job with the City.

23.     Ms. Diez, his supervisor, constantly called him, emailed him, requested his presence, or asked him to escort her to her vehicle, meetings, lunches, as well as happy hours after work, with no other employees present or attending.

24.     Diez would engage in subtle touches on Price. Price's shoulder, his back, his arm. This made Price very uncomfortable, but Price did not want to offend his new supervisor, and she insisted that she wanted to be friends with him.

25.     Diez would question Price about his personal life, like who he was dating, whether he was dating, what he looked for in women, whom he would see himself with, and occasionally asking if he would date Jennifer Bell, whether he liked Jennifer Bell, and if he ever dated outside of his race.

26.     Diez would make other inappropriate comments such as "I put a spell on men" and how she can break up happy homes, neighbors, ex-bosses, ex-boyfriends all because she had a "mean sex game, blond hair and blue eyes."

27.     Diez would make Price feel uncomfortable in passing at the office – she would stand extremely close to Price and would brush up on him.

28.     Diez would wear inappropriate work attire – often wearing low-cut shirts. During one meeting her shirt popped open and Diez thought it was funny. (Diez made a joke in reference to baking bread).

29. Diez shared inappropriate anecdotes. For instance, Diez told Price how she could get G.F. (male), Director of the Code Administration even though he was married, and that she would do this by showing her bust and giving him "the look" because she heard he had a "PHD" or "pretty huge [male genitalia]."

30. Diez boasted that other female employees of the City were uncomfortable with her because of the size of her chest.

31. Diez often held closed-door one-on-one meetings with Price where she would go over site plans with him and lean over pointing to things with cleavage in near proximity of Price's face.

32. Due to the amount of work, Price often left after scheduled hours. Diez was aware of this and would stay late as well and made sure to leave at the same time that Price would leave. Diez asked Price if he could walk her to her vehicle or to drive her to her car or to drop Price off at his, to continue conversation and asking him to make her laugh.

33. Even after both had departed, Diez would call Price and send him text messages on his work cell phone, and she would speak to him during his drive to the gym about non-work-related matters. Diez would call Price after his workout and inquired about his workout and whether he "got sweaty."

34. Diez informally introduced Price to her ex-boss, K.S., over the phone at one point. Diez showed Price a picture of him where his chest was showing. (whats the point of this?  IS there something else that makes this worth bringing this up?)

35. Diez informed Price that K.S.'s wife found a call log of him calling Diez over 800 times (She was presumably embellishing).

36. Diez told Price that K.S. had to line his undergarments whenever he saw her because he would become aroused and would [pre-ejaculate].

37. Diez told Price that K.S. wanted to leave his wife but he could not afford it, and that Diez did not want him anyway and she was just playing with him.

38. Price never acted on her flirting, never acknowledged her advances, but this seemed to encourage her flirtatious efforts.

39. Price was concerned for his job, so felt pressure to accept her behavior, ignore it as best he could, and do his best to perform well at his job.

40. Price discussed the situation with his supervisor with his girlfriend, Bell, to decide how to handle things as it was very uncomfortable for him dealing with Diez's constant inappropriate behavior.

41. Price decided to deal with it as best he could, ignore it when he could, and get through the early months of his employment while he established himself on the job.

42. On a weekly basis, Price would ask Diez about his work performance, as he was excited for the new job/position, was working hard and was hoping his supervisor was happy to date.

43. Diez would always respond that he was doing great and fitting in well.

44. On November 25, 2018, Diez emailed Price letting him know that he was doing a great job and that things were stabilizing and that upon his return from vacation she would like to see him to ensure he has a positive six-month review. Diez also informed Price that he could take leave without pay, if he needed to, for his upcoming vacation.

6

45. On November 27, 2018, Price sent Diez a text letting her know that he would email her his time as he could not access Kronos, the payroll system, while away from the office. Diez replied with "I'll approve all. Have Danyell or whoever get in touch with me."

46. On November 29, 2018, Price sent Danyell a text message with his leave for Diez to enter/approve.

47. On December 2, 2018, while on vacation, Price's girlfriend received a copy of a text message between two of her co-workers, one being Diez. In the text Diez states: "So...Courtney...and Jenn... They're boyfriend and girlfriend. They don't know I know and I'm not saying anything. So...does your lack of shock mean you already knew? See...I'm always last. Haha."

48. Upon Price's return on December 5, 2018, Diez was acting different towards Price.

49. Diez now realized that Price was not going to be the subject of her advances and that the entire time it was not something he was interested in.

50. This upset Diez.

51. One of Price's subordinates told Price that Diez asked questions about Price's relationship with Bell, and that after the conversation Diez went into her office and cried.

52. Bell, Price's girlfriend, went to the Director of the department on December 14, 2018, to disclose her relationship with Price after seeing the changes in Diez's behavior. The Director stated he did not understand the issue.

53. Coincidentally, also on December 14, 2018, Diez removed Price's viewing permission from the Outlook calendar.

54. Diez started micromanaging Price's workload, requested day to day tasks reports, overruled his decisions / recommendations for completing tasks, scheduled meetings back-to-back,

requested items in unreasonable times, removed Price's permissions from systems, became unresponsive to questions, informed Price that his work schedule was from 8:00 a.m. to 5:00 p.m. with a one-hour lunch, and Diez would talk with the employees in the Permit Center about how Price was no longer her "bff."

55.	That was all fine with Price, as he was only interested in doing hos job, serving the City of Alexandria as best he could, and remaining committed to his girlfriend.

56.	On January 3, 2019, Diez met with Price. Price thought this was going to be a meeting to prepare for his six-month evaluation, but it was not. Price was presented with a letter of "recommendation for separation."

57.	Price knew it was not his performance that was the problem; he was surprised Diez would do this to him for not accepting her advances.

58.	Diez claimed she was recommending Price be terminated for using the City parking placard on his personal vehicle (which is the *actual purpose* of the placard), and for fraudulently submitting his time to the system (which he did not submit and which *she* approved - when he could not access the system but sent his time to Danyell as directed by Diez after she told him she would approve his leave without pay).

59.	Price went to meet with Steve Mason (resigned 9/13/19 after 40 years) and Barbara DiRenzo and Price discussed Diez's behavior with them.

60.	Price explained how Diez had behaved since he was hired and explained that the two alleged "issues" she raised re his performance were blatantly false.

61.	Price was told by Mason it would be taken care of, but "don't let me see you in my office again after this." During the discussion Mr. Mason stated it sounded like Diez had a thing for Price.

62. Price was happy that Mason recognized what was going on, that he did not seem surprised, and that he would handle it; but Price was confused by the fact he was being discouraged from bringing any other problems to management.

63. Price further felt a sense of relief, as he was afraid to complain about his supervisor for fear of being retaliated against and perhaps losing his job.

64. Yet, his worst fears came true; he was retaliated against -- after being told it would be taken care of by Mason, it was not taken care of, the baseless allegations against him were allowed to stand, and Price was terminated.

65. Price received a letter from the Deputy Human Resources Officer dated January 23, 2019, "upholding your department's recommendation for termination effective January 25, 2019."

66. After receiving the letter upholding termination, Price attempted to get in contact with Mason and/or DiRenzo. When he finally spoke to DiRenzo she stated she found a lot of information during her investigation but would not provide him with any of it.

67. Price was shocked and disappointed. It was hard to believe that the City of Alexandria would tolerate Diez's behavior, cover it up, and uphold the recommendation by Diez to terminate him. Rather than applaud a hard-working employee who was standing by and proud of his commitment to his partner / girlfriend, the City supported the sexually harassing inappropriate female supervisor who boasted about her conquests and the homes she broke up.

68. Price felt as if the City did not believe him that he did not appreciate Diez's advances, that he was committed to his girlfriend, and that Diez's behavior made him uncomfortable.

69. Revealing the complete double standard and discrimination engaged in by the City, Price's complaints were ignored, he was fired for baseless reasons, and his supervisor was protected by the higher ups. That would never happen had Price been a female and Diez a male.

70. On May 9, 2019, Price filed his EEOC charge, and the City began an investigation into the allegations.

71. By letter ("No Spoliation Letter") dated May 20, 2019, Price (by counsel) advised the City to preserve evidence – Diez's work cell phone records, text messages, call logs, and her emails (**Ex C**).

72. Price tolerated Diez's behavior, as uncomfortable as it was, so that he could continue to serve the City of Alexandria.

73. Yet the City turned its back on him when he needed it to protect him from a hostile work environment, sexual harassment, and retaliation.

74. The behavior of Diez and how this was handled by the City has cause considerable emotional distress for Price, embarrassment as he was terminated, and depressing given the response of the City in protecting Diez and ending his career with Alexandria just as it got started.

75. Price at all times met his employer's expectations in the performance of his job duties.

76. The City of Alexandria's discrimination and retaliation against Plaintiff have resulted in significant emotional distress, stress, anxiety, fear of a failed municipal system, and it has further affected his compensation (unemployed until very recently).

77. The affirmative defense of *Faragher*[1] and *Ellerth*[2] allows an employer to avoid strict liability for a supervisor's harassment of an employee if no tangible employment action was taken against the employee. Examples of tangible employment action include "discharge, demotion, or undesirable reassignment." *Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 266 (4th Cir.2001).

78. Plaintiff here suffered tangible employment actions from his supervisor when she recommended he be terminated, and that recommendation was upheld by the City. As a result, "vicarious liability is absolute." *Mikels v. City of Durhum*, 183 F.3d. 323, 332 (4th Cir. 1999).

## COUNT I.
## HOSTILE ENVIRONMENT / SEUXAL HARASSMENT - 42 USC § 1983

79. Plaintiff alleges and incorporates all the paragraphs above.

80. Defendant created a hostile work environment and/or harassed Plaintiff, the offending conduct was unwelcome, was sufficiently server or pervasive when it altered the conditions of Plaintiff's employment and created an abusive work environment and was imputable to his employer.

81. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to emotional distress arising from his suffering the environment during his employ, and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf.

82. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

---

[1] *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)
[2] *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742 (1998)

11

## COUNT II
## RETALIATION – 42 USC § 1983

83. Plaintiff alleges and incorporates all the above paragraphs.

84. Plaintiff engaged in protected activity and opposition to unlawful practices while employed by the Defendant.

85. As a result of his protected activity and opposition to unlawful practices, Plaintiff was subjected to an adverse employment action -- termination.

86. A casual connection exists between Plaintiff's protected activities and the adverse employment action taken by Defendant.

87. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by his wrongful termination and resultant financial hardship.

88. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT III.
## HOSTILE ENVIRONMENT / SEXUAL HARASSMENT - TITLE VII

89. Plaintiff alleges and incorporates all the paragraphs above.

90.     Defendant created a hostile work environment and/or sexually harassed Plaintiff; the offending conduct was unwelcome, was sufficiently severe or pervasive when it altered the conditions of his employment and created an abusive work environment and was imputable to his employer.

91.     As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to emotional distress arising from his suffering the environment during his employ, and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf.

92.     As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT IV
## RETALIATION – TITLE VII

93.     Plaintiff alleges and incorporates all the above paragraphs.

94.     Plaintiff engaged in protected activity and opposition to unlawful practices while employed by the Defendant.

95.     As a result of his protected activity and opposition to unlawful practices, Plaintiff was subjected to an adverse employment action -- termination.

96.     A casual connection exists between Plaintiff's protected activities and the adverse employment action taken by Defendant.

97.     As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement

savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by his wrongful termination and resultant financial hardship.

98. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Courtney Price respectfully requests the following:

A. Enter judgment for the Plaintiff Courtney Price against the Defendant on all counts;

B. Award the Plaintiff punitive damages in the maximum amount allowed by law and that would be sufficient to ensure the Defendant takes complying with the law seriously.

C. Award the Plaintiff full back pay and front pay, including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, bonuses', cash awards, loss of retirement savings and benefits and other remuneration and privileges of employment retroactive to the date of any unlawful employment action found to have occurred in this case.

D. Award the Plaintiff $250,000.00 compensatory damages for emotional distress injuries;

E. Award Plaintiff pecuniary and out of pocket expenses;

F. Order Defendant to pay all reasonable attorney's fees, court costs, expert fees, and expenses, incurred by Plaintiff as a result of Defendant's actions and inactions, as well as pre-judgment and post-judgment interest; and

G. Order any and all other such other equitable and legal relief as the Court deems just and appropriate.

## **JURY TRIAL DEMANDED.**

Plaintiff demands a jury trial on all claims to triable.

>Respectfully submitted.
>
>**COURTNEY PRICE**
>
>By Counsel,
>
>**THE BROWN FIRM PLLC**
>
>By: __/s/_____
>Christopher E. Brown, Esq.
>VSB#39852
>526 King St. Suite 213
>Alexandria, VA 22314
>Tel: 703-924-0223
>Fax: 703-997-2362
>cbrown@brownfirmpllc.com
>*Counsel for Plaintiff Price*